**UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **CASE NO. 21-CR-036 (CJN)** |
| | **:** | |
| **GINA BISIGNANO,** | **:** | |
| **Defendant.** | **:** | |

## <u>APPEAL OF RELEASE ORDER</u>

On January 6, 2021, the words of defendant Gina Bisignano, amplified by a large bullhorn, rang out over the noise of hundreds of rioters attempting to breach the west side of the U.S. Capitol building: "Everybody, we need gas masks! We need weapons! We need strong, angry patriots to help our boys! They don't want to leave. We need protection!" Moments later, and mere feet away, a rioter with a baseball bat struck the shield of a police officer holding the sallyport, the last line of defense between the mob and the doorway into the Capitol building. The defendant continued, "This is 1776! And we the people will never give up," while another rioter sprayed the police line with a fire extinguisher, and eventually hurled it at one of the officers. Indeed, the defendant herself took to combatting the officers protecting that entrance to the Capitol, throwing a water bottle at the police line while standing above the crowd on a ledge in the sallyport--all the while recruiting more and more rioters to push on the police line in a coordinated heave-ho. The defendant was not a mere bystander at the January 6th Capitol riot; she was an instigator, a director, and an active participant in the violence, destruction and obstruction at the Capitol that day.

For the reasons fully discussed below, the government moves this Court to review the decision by the Magistrate Judge in the Central District of California, and grant the government's motion to

detain the defendant pending resolution of the instant criminal case.  In support thereof, the government states the following:

## I. **<u>BACKGROUND</u>**

### A. **Statement of Facts**

On January 6, 2021, a joint session of the United States Congress convened at the United States Capitol, which is located at First Street, SE, in Washington, D.C. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the United States Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020. The joint session began at approximately 1:00 p.m. Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection.  Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

The U.S. Capitol is secured 24 hours a day by U.S. Capitol Police. Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by U.S. Capitol Police. Only authorized people with appropriate identification are allowed access inside the U.S. Capitol. On January 6, 2021, the exterior plaza of the U.S. Capitol was also closed to members of the public.

As the proceedings continued in both the House and the Senate, and with Vice President Mike Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol. As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and U.S. Capitol Police were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

At such time, the certification proceedings still underway and the exterior doors and windows

of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol; however, between 1:00 p.m. and 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of the U.S. Capitol Police, as others in the crowd encouraged and assisted those acts.

Shortly thereafter, members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers. Accordingly, the joint session of the United States Congress was effectively suspended until shortly after 8:00 p.m. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the sessions resumed.

During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.

Beginning on or about January 10, 2021, the FBI received at least six tips identifying Gina Bisignano ("Bisignano") as a participant in the January 6, 2021 riot at the U.S. Capitol. Bisignano was identified because, in a video filmed in the crowd directly in front of the Capitol and viewed by your affiant, Bisignano stated her first and last name, her place of residence, and her Instagram account. In a separate video from January 6, Bisignano also stated the name of her business while speaking through a bullhorn to the crowd. A California DMV photo obtained by the FBI confirmed her identity.

Video shows Bisignano in a crowd of rioters struggling with police officers in a sallyport in an attempt to gain entry to the Capitol. The rioters are seen repeatedly utilizing what appears to be a red aerosol spray on the officers, striking or attempting to strike the officers, and physically pushing the

police line in an attempt to gain entry to the Capitol. In this video, a police officer is seen being crushed against a door while a rioter grabs his gas mask. Bisignano appears to be in the first few ranks of the tightly-packed rioters and is seen on video struggling with a police officer attempting to expel her and others from the Capitol sallyport. On video, Bisignano appears to say to the officer "…you hurt my f---ing leg." The cropped image below is a still shot from the video, which depicts the top of Bisignano's head and the helmet of a police officer. After being expelled from the Capitol sallyport by police officers, Bisignano raises her fist in an apparent gesture of defiance.







In these images, Bisignano's hair, sunglasses, apparel, and makeup match those seen in the video in which Bisignano states her name, place of residence, and Instagram account. Specifically, Bisignano wears an identifiable Louis Vuitton sweater throughout the riot.

In a separate video, Bisignano is seen using a bullhorn just outside the Capitol to exhort other

rioters to move into the Capitol. On video, Bisignano states "…Gina's Beverly Hills…Everybody, we need gas masks…we need weapons...we need strong, angry patriots to help our boys. They don't want to leave. We need protection." As Bisignano is speaking, rioters approximately ten feet to Bisignano's left are physically assaulting police officers preventing entry into the Capitol. Seconds after Bisignano states the foregoing, at least one individual begins striking at officers in the police line with what appears to be a baseball bat.







In another video, Bisignano is seen feet from police officers as the large crowd of rioters chants "Police stand down."

In still another video, Bisignano is heard speaking into a bullhorn stating "We the people are not going to take it any more. You are not going to take away our [unintelligible]. You are not going to take away our votes. And our freedom, and I thank God for it. This is 1776, and we the people will never give up. We will never let our country go to the globalists. George Soros, you can go to hell." As

Bisignano is speaking, other members of the crowd to Bisignano's immediate left assault the police officers by spraying a fire extinguisher at them, by striking their shields with what appear to be batons, and by throwing objects at the police. At the end of the video, the camera pans to Bisignano, clearly showing her.

Bisignano physically entered the Capitol and encouraged other rioters to enter as well.







In another video, Bisignano appears to enter the Capitol through a small square opening that leads to the interior of the Capitol. She addresses other rioters from what appears to be the inside of the building, stating "…we need Americans. Come on guys. We need patriots! You guys, it's the way in. We need some people, we need some people." Another individual is then heard yelling "if you have a weapon, you need to get your weapon." A male rioter then addresses Bisignano: "he said, that they said, that they're gonna use lethal force" while gesturing towards the interior of the Capitol. The male then says to Bisignano "what did you hear?" Bisignano replies "I heard that they were, but if we're Americans, we all need to stick together." The male says "You heard it?" and Bisignano confirms "Yes I did." In another video, Bisignano states in part "they sprayed me in the face" and gestures to the makeup in disarray on her face as apparent proof.





Bisignano tweeted her intention to attend the protest. According to publicly-available information, Donald Trump, using Twitter account @realDonaldTrump, tweeted on or about December 19, 2020: "Big protest in D.C. on January 6th. Be there, will be wild!" Bisignano appeared to reply to this message:



After January 6, Bisignano appeared to receive backlash for her presence at the riot on her business's Yelp review page. In replies to negative reviews, Bisignano appeared to confirm her

presence at the riot and entry into the Capitol, claiming that "I was let in".



**gina b.**
Business Owner

1/11/2021

I am there to  stop the steal no one incites violence a against law Enforcement we back the blue and respect law and order !it's a crime for you to make statements about me I am pro life pro trump we back the blue joe Biden is who I was protesting against stop the steal for our American people ! You are a liar !!! This has nothing to do with my work I am a 50 year old woman alone no laws are broken I was let in I have the right to peaceful assembly you are defaming mei am contacting someone about this slander !this is serious

Read less

On January 14, 2021, The Beverly Hills Courier published an article "based on more than two hours of interviews with Bisignano," detailing her activities before and during the riot on January 6, 2021. Bisignano confirmed her presence at the Capitol, stating she felt called upon by President Donald Trump to travel to D.C. to change the outcome of the election, which she believes was stolen.  Bisignano admitted traveling to D.C. with at least one other person she knew from a previous rally. Bisignano told the news outlet that she filmed herself at the Capitol building, during the time when rioters had stolen police shields and were deploying pepper spray on the officers. Bisignano also admitted entering the Capitol building itself through a window, the glass of which had been broken by another rioter.

**B.      Procedural Posture**

On January 19, 2021, the Defendant was arrested on an arrest warrant issued out of the United States District Court for the District of Columbia by Magistrate Judge Zia M. Faruqui in connection with a Criminal Complaint charging the defendant with the following offenses:  Civil Disorder, in violation of 18 U.S.C. § 231(a); Aiding and Abetting Destruction of Property, in violation of 18 U.S.C. § 1361, § 2; Obstruction of a Congressional Proceeding, in violation of 18

U.S.C. § 1512(c)(2); Entering and Remaining in a Restricted Building, in violation of 18 U.S.C. 1752(a)(1), (2) and (4); and Disorderly and Disruptive Conduct on Capitol Grounds, in violation of 40 U.S.C. 5104(e)(2)(D).

The Defendant made her initial appearance that same day before Magistrate Judge John E. McDermott of the Central District of California. At that time, the Government made an oral motion for the Defendant's detention pursuant to 18 U.S.C. § 3142(f)(1)(A). The Defendant moved for immediate release. During the hearing, the Magistrate Judge ordered the Defendant released into house arrest with GPS monitoring, on a signature bond for $70,000, to be replaced in 10 days with $150,000 from responsible sureties. The Government filed an emergency motion for immediate stay of the order of release from this Court, pending review of the detention decision. Chief Judge Howell granted the emergency motion, and ordered a stay of release and order of transportation to the District of Columbia.

On January 29, 2021, a grand jury indicted the defendant in a seven-count indictment, charging her with violations of 18 U.S.C. § 1512, § 2 (Obstruction of an Official Proceeding and Aiding and Abetting); 18 U.S.C. § 231 (Civil Disorder); 18 U.S.C. § 1361, § 2 (Destruction of Government Property and Aiding and Abetting); 18 U.S.C. § 1752(a)(1) (Entering and Remaining in a Restricted Building or Grounds); 18 U.S.C. § 1752(a)(2) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds); 18 U.S.C. § 1752(a)(4) (Engaging in Physical Violence in a Restricted Building or Grounds); and 40 U.S.C. § 5104(e)(2)(D). The defendant faces a maximum penalty of 20 years' incarceration for these offenses.

The government comes now requesting review of the release decision by Magistrate Judge McDermott.

## II.  **ARGUMENT**

### A.  Basis for Review and Legal Standard

Title 18, U.S.C. § 3145(a) states:

> **A.  Review of a release order –** If a person is ordered released by a magistrate, …
>
> > •   the attorney for the Government may file, with the court having original jurisdiction over the offense, a motion for revocation of  the order or amendment of the conditions of release . . .

The motion shall be determined promptly.

On the government's motion to review a release order, this Court considers *de novo* the Magistrate Judge's denial of pre-trial detention.  In its discretion, the Court may proceed to rehear the evidence by recalling the witnesses, reviewing transcripts, or by proceeding through proffer and argument. It may take additional evidence from new witnesses or consider arguments not previously raised. In short, the Court may proceed as best enables it to resolve the question posed:  whether any condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community? As the legislative history of the 1984 Bail Reform Act amendments shows:

> [T]he language referring to the safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community. The committee intends that the concern about safety be given a broader construction than merely danger of harm involving violence. . . .

See S.Rep. No. 225, 98th Cong., 2d Sess. 307, reprinted in 1984 U.S. Code Cong. & Ad. News 3182, 3195-3196.[1]

---

[1] To that end, it is worthwhile recalling Congress' intent in 1984 when it enacted the current version of the Bail Reform Act:

Defendant is subject to detention pursuant to 18 U.S.C. § 3132(f)(1)(A) because the second charged offense—18 U.S.C. § 1361—is a crime of violence as defined by 18 U.S.C. §3156(a)(4)(C) (defining a "crime of violence" to include violations of Chapter 77, under which violations of 18 U.S.C. § 1591(a), (b)(1) fall and Chapter 117, under which violations of 18 U.S.C. § 2423(b) fall).

In determining whether the defendant should be detained, the Court must consider the following factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. See 18 U.S.C. § 3142(g). In this case, there are no condition or combination of conditions that will reasonably assure the safety of the community if the defendant is released, and the government argues she must be held pending disposition in this matter.

**B.  The Bail Reform Act factors Strongly Support Incarceration**

As the Government argued in at the combined initial appearance and detention hearing, there

---

> Many of the changes in the Bail Reform Act reflect the . . . determination that Federal bail laws must . . . give the courts adequate authority to make release decisions that give appropriate recognition to the danger a person may pose to others if released. . . . The constraints of the Bail Reform Act fail to grant the Courts the authority to impose conditions of release geared toward assuring community safety, or the authority to deny release to those defendants who pose an especially grave risk to the safety of the community. . . . *This broad base of support for giving judges the authority to weigh risks to community safety in pretrial release decisions is a reflection of the deep public concern, which the Committee shares, about the growing problem of crimes committed by persons on release.*

See S.Rep. No. 225, 98th Cong., 2d Sess. 307, reprinted in 1984 U.S. Code Cong. & Ad. News 3182, 3486-3487. (Emphasis added.)

is no condition or combination of conditions that will reasonably assure the safety of any other person and the community should the defendant be released. An analysis of the § 3142(g) factors supports that argument.

1. **The Nature and Circumstances of the Offense Charged**

The particular facts of this case are uniquely disturbing. The defendant traveled from Los Angeles, California to this jurisdiction and participated in one of the most riotous acts of insurrection the nation's capital has ever seen. The actions of the rioters delayed the session of Congress, which was convened to certify the results of the 2020 Presidential Election. The normal functioning of our democracy was put at risk because of the riot.

The Defendant is charged with a crime of violence, Aiding and Abetting Destruction of Government Property, in violation of 18 U.S.C § 1361, § 2.  Three of the charges in the indictment are felonies, including one that carries a maximum penalty of 20 years' incarceration, Obstruction of a Congressional Proceeding, in violation of 18 U.S.C. § 1512(c).   By no means was the defendant a mere bystander in the activities. On January 6, 2021, the defendant was with a group of rioters who crushed a law enforcement officer in a door while they attempted to illegally gain entry to the Capitol building. She stood with a crowd of rioters who were striking officers defending the building. She used her bullhorn to encourage "patriots" with "weapons" and "gas masks" to assist the rioters attempting to illegally occupy the capitol. Moments after this call to arms, a rioter hit a law enforcement officer with a baseball bat, mere feet away from the defendant. And she even encouraged others to enter the building after she heard that "lethal force" was being used in the building.

By directly encouraging violence and destruction through the use of her bullhorn, the

defendant fueled a situation that created a danger not only to law enforcement officers attempting to quell the riot, but to the building which stands for democracy itself, when a session of Congress certifying the peaceful transfer of power was attempting to take place.  This factor strongly favors her detention.

**2.   The Weight of the Evidence Against the Defendant**

The evidence against the defendant is overwhelming, including not only photographs and videos of her participating in the offenses alleged, but her own words to the media confirming her illegal presence on the Capitol grounds that day. She is a highly visible figure in the insurrection that occurred, and therefore, this factor weighs in favor of detention.

**3.   The History and Characteristics of the Defendant**

The offenses committed by the defendant illuminate characteristics inconsistent with a person who could follow orders given by this Court, or indeed, any branch of the federal government. The defendant has espoused disbelief in the outcome of the 2020 Presidential election, and violently acted on that world view. The defendant clearly defied the orders of law enforcement officers who were trying to restore order at the Capitol, and indeed escalated the chaos and danger those members of law enforcement. When faced with the decision whether or not to obey law enforcement, the defendant chose to defy them, and cannot be trusted to follow orders of this Court as a result.

Additionally, the defendant has a strong social media presence, and even announced her social media handles while inciting violence at the Capitol. The defendant cannot be trusted to keep from inciting, contacting or coordinating with other radical extremists, intent on continuing to obstruct the normal functioning of our democracy. Given her participation in the obstruction of

the normal functioning of the government, and her disbelief in the legitimacy of the current United States government, it is unlikely that the defendant will obey any pretrial release conditions.

The pretrial services agency's report from the Central District of California notes the defendant has one conviction for Driving under the Influence in 2010. The defendant has no known ties to this jurisdiction, and traveled back to California after committing the crimes alleged in the indictment.

Finally, upon execution of the authorized search warrant of her residence on January 19, 2021, law enforcement found a loaded firearm in the home, which was not registered to the defendant, but over which the defendant claimed ownership. Access to firearms in combination with her inciting violence at the Capitol building makes her uniquely dangerous. This factor also weighs in favor of detention.

### 4. **The Nature and Seriousness of the Danger to Any Person or the Community**

Finally, the fourth factor, the nature and seriousness of any danger to the community, strongly favors detention. It bears repeating that the defendant was an active participant in the most violent insurrection to occur at the U.S. Capitol in over 200 years. Specifically, this defendant was part of a group of rioters who battled with police officers, striking those members of law enforcement attempting to protect the seat of the federal government. The defendant used a bullhorn to encourage any rioters who had "weapons" and "gas masks" to assist in this endeavor of fighting the police, in order to illegally occupy and remain in the Capitol. And upon her return to California, she was found to have armed herself with a firearm registered to someone else. She is a danger to the continued operation of the federal government, the law enforcement officers dedicated to protecting that government, and to the community at large.

An analysis of the factors under 18 U.S.C. § 3142(g) demonstrates that the Defendant should remain detained pending trial. As a result, the government requests review of Magistrate Judge McDermotts's decision to release defendant and seeks a continued stay of the order from this Court.

Respectfully submitted,

MICHAEL SHERWIN
UNITED STATES ATTORNEY


___/s/_____

KIMBERLY  L. PASCHALL
Assistant United States Attorney
D.C. Bar 1015665
U.S. Attorney's Office
555 4th Street, N.W., Room 4116
Washington, D.C. 20530
202-252-2650
Kimberly.Paschall@usdoj.gov