**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 21-CR-036 (CJN)** |
| | : | |
| **GINA BISIGNANO,** | : | |
| | : | |
| Defendant. | : | |

**UNITED STATES'S OMNIBUS MOTIONS *IN LIMINE***

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this omnibus brief arguing motions *in limine* in advance of the trial in this case scheduled for August 5, 2024. As ordered by the Court, ECF No. 87, the government met and conferred with defense counsel about the following motions, and they have indicated that they plan to oppose.

Although neither the Federal Rules of Civil Procedure nor the Federal Rules of Evidence expressly contemplate motions *in limine*, the practice of allowing such motions has developed over time "pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n. 4 (1984). "Motions in limine are designed to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions." *Barnes v. D.C.*, 924 F. Supp. 2d 74, 78 (D.D.C. 2013) (quoting *Graves v. District of Columbia*, 850 F.Supp.2d 6, 10 (D.D.C. 2011)).

The United States offers the authorities and analysis below to promote efficiency and reduce the need to argue objections midtrial. For each motion herein, the United States asks that

1

the Court grant the requested relief or, if the Court reserves ruling, to consider the below arguments when the relevant issues arise during trial.

## I.    Motion *in Limine* To Admit Certain Categories of Multimedia

On July 15, 2024, the United States will provide its exhibits to defense and to the Court. *See* ECF No. 87.  The United States anticipates providing to the defense certain categories of photographic and video exhibits that it intends to offer at trial.  The following sections describe each category of evidence and explain why each is admissible as relevant and authentic.

### A.    Legal Framework

"As a general rule, tangible evidence such as photographs must be properly identified or authenticated before being admitted into evidence at trial."  *United States v. Blackwell*, 694 F.2d 1325, 1329 (D.C. Cir. 1982).  To satisfy this requirement, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."  Fed. R. Evid. 901(a).  Rule 901(b) provides a nonexhaustive list of examples of methods for showing authenticity.  Those include, as relevant here:

> (1) Testimony of a Witness with Knowledge.  Testimony that an item is what it is claimed to be.
>  . . . .
> (3) Comparison by an Expert Witness or the Trier of Fact.  A comparison with an authenticated specimen by an expert witness or the trier of fact.
> (4) Distinctive Characteristics and the Like.  The appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances.
>  . . . .
> (7) Evidence About Public Records.  Evidence that: (A) a document was recorded or filed in a public office as authorized by law; or (B) a purported public record or statement is from the office where items of this kind are kept.
>  . . . .
> (9) Evidence About a Process or System.  Evidence describing a process or system and showing that it produces an accurate result.

Fed. R. Evid. 901(b).

In making the showing necessary for admissibility, "the proponent's 'burden of proof'" is "slight," and the "ultimate resolution of the evidence's authenticity is reserved for the jury." *United States v. Hassanshahi*, 195 F. Supp. 3d 35, 48 (D.D.C. 2016) (quoting *McQueeney v. Wilmington Tr. Co.*, 779 F.2d 916, 928 (3d Cir. 1985)); *United States v. Safavian*, 435 F. Supp. 2d 36, 38 (D.D.C. 2006). To make the requisite prima facie showing, "circumstantial evidence of authenticity can be sufficient." *United States v. Bruner*, 657 F.2d 1278, 1284 (D.C. Cir. 1981). And such evidence need not "rule out all possibilities inconsistent with authenticity, [nor] prove beyond any doubt that the evidence is what it purports to be." *Hassanshahi*, 195 F. Supp. 3d at 48 (quoting *United States v. Pluta*, 176 F.3d 43, 49 (2d Cir. 1999)). Rather, the party offering the evidence need only "demonstrate that, as a matter of reasonable probability, possibilities of misidentification and adulteration have been eliminated." *United States v. Celis*, 608 F.3d 818, 842 (D.C. Cir. 2010) (quoting *United States v. Stewart*, 104 F.3d 1377, 1383 (D.C. Cir. 1997)).

In a previous trial arising from the January 6, 2021 riot, in which a defendant contested the authenticity of video evidence proffered by the United States, another court in this district described the authenticity threshold for the factfinder to consider the proffered evidence as follows: "The question here is, therefore, whether the government's showing regarding the open-source videos could permit a reasonable fact-finder to find that they are, in fact, what the government claims." *United States v. Kyle Fitzsimons*, Trial Tr. 09/27/22 ("Fitzsimons Verdict"), at 4.

### B. Overlapping Bases for Authentication of Multimedia

As introduced herein, there are multiple, overlapping bases that the United States intends to use for the authentication of photographs and videos at trial. The United States offers this nonexclusive list of bases for authentication for the Court to consider should the United States be

unable to enter into stipulations with the defendant in advance of trial and the defendant objects to the authenticity of the proposed multimedia exhibits.

### 1.  Authentication by a Witness with Knowledge

To begin, any witness with knowledge of the events depicted in a photograph or video can authenticate the evidence, including but not limited to the person who took the photograph or video.  *See* Fed. R. Evid. 901(b)(1).  Here, that includes any person who was present for the events depicted in the photograph or video and has a recollection sufficient for them to recognize the scene depicted.  *See, e.g.*, *Am. Wrecking Corp. v. Sec'y of Lab.*, 351 F.3d 1254, 1262 (D.C. Cir. 2003).  Any individual that observed the events depicted in the photograph or video can testify that the photograph or video appears to fairly and accurately show the events that took place.  *See* Fed. R. Evid. 901(b)(1); *see also United States v. Rembert*, 863 F.2d 1023, 1026 (D.C. Cir. 1988).

Even a person who was not present for a specific event can circumstantially establish the authenticity of a photograph or video depicting that event if they can (1) identify the location(s) depicted in the video; and (2) establish that the video is generally consistent with their knowledge of events that occurred at that location.  *See, e.g.*, *Rembert*, 863 F. 2d at 1028 ("Even if direct testimony as to foundation matters is absent . . . the contents of a photograph itself, together with such other circumstantial or indirect evidence as bears upon the issue, may serve to explain and authenticate a photograph sufficiently to justify its admission into evidence." (alteration in original) (quoting *United States v. Stearns*, 550 F.2d 1167, 1171 (9th Cir. 1977) (Kennedy, J.))); *United States v. Holmquist*, 36 F.3d 154, 169 (1st Cir. 1994) ("A photograph's contents, buttressed by indirect or circumstantial evidence, can form a sufficient basis for authentication even without the testimony of the photographer or some other person who was present at the time it was taken."). On this authority, the United States could authenticate riot footage through, for example, the

testimony of an experienced U.S. Capitol Police officer who is familiar with the areas of the Capitol depicted in the footage and who knows that the events of January 6 are unique in modern history. *Cf. Safavian*, 435 F. Supp. 2d at 40–42 (authenticating emails based on "distinctive characteristics" and citing Fed. R. Evid. 901(b)(4)); *Klayman v. Judicial Watch*, 299 F. Supp. 3d 141, 145–46 (D.D.C. 2018) (admitting emails and advertisements by comparing later versions with admitted versions). Again, this is a low bar that requires only a prima facie showing that the evidence is what the United States purports it to be—namely, photographs and videos of the Capitol siege in progress.

## 2. Authentication by Metadata

Where necessary, the United States can also authenticate the specific time or place of a photograph or video using metadata. When a digital media file is extracted from a device or otherwise seized by the government, it often contains metadata that specifies the time, and sometimes the place, the file was created, along with other information. At trial, the United States will sometimes call law enforcement personnel to testify about the process of extracting data from digital devices and reviewing the extracted materials. Such testimony is sufficient to make a prima facie showing that a photograph or video was made at the time or place reflected in the metadata. *See, e.g.*, *United States v. Banks*, 43 F.4th 912, 918 (8th Cir. 2022) ("While the officers were not present when the images and videos were first captured, their testimony [about reviewing extraction reports] provided a rational basis to believe that the exhibits had been created within the relevant time frame and stored on [the defendant's] cellular phones."); *Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534, 547–48 (D. Md. 2007) ("Because metadata shows the date, time and identity of the creator of an electronic record, as well as all changes made to it, metadata is a distinctive characteristic of all electronic evidence that can be used to authenticate it under Rule 901(b)(4).");

*United States v. Gilbreath*, No. 3:19-CR-127-TAV-HBG, 2020 WL 5441226, at *3 (E.D. Tenn. Sept. 10, 2020) ("Metadata . . . showed that these images were created at defendant's home and on defendant's cell phone on September 12, 2015.").

### 3. Authentication by Comparison

Similarly and alternatively, in instances where precision of time and place is relevant but cannot be established by a witness with knowledge or by the media's metadata, the United States will authenticate exhibits by reference to other, already-authenticated exhibits depicting the same time and place. This method of "[a]uthentication by comparison is routine." *Valve Corp. v. Ironburg Inventions Ltd.*, 8 F.4th 1364, 1371 (Fed. Cir. 2021); *see also United States v. Hoyt*, 946 F.2d 127, at *1 (D.C. Cir. 1991) (unpublished) (noting that Fed. R. Evid. 901(b)(3) permits authentication by comparison); *Stearns*, 550 F.2d at 1171 (finding that the first picture "authenticates the other four pictures as to time"); *Safavian*, 435 F. Supp. 2d at 40 (allowing authentication of emails by means of comparison with other "e-mails that already have been independently authenticated"). Judge Contreras, in the *Fitzsimon* trial, held that the United States had adequately authenticated eight videos by showing that they were consistent with other videos, including body-warn camera video and closed-circuit video, which had been introduced into evidence through other means. Fitzsimons Verdict, at 5–6.

### 4. Authentication Based on a Process or System that Produces an Accurate Result

Certain multimedia, such as security cameras (CCTV) operated by the U.S. Capitol Police (USCP) and body-worn cameras (BWC) worn by officers of the Metropolitan Police Department (MPD) can be authenticated by "describing a process or system and showing that it produces an accurate result," Fed. R. Evid 901(b)(9). *See United States v. Dale*, 991 F.2d 819, 843 (D.C. Cir. 1993) ("Tapes may be authenticated by testimony describing the process or system that created

the tape."); *United States v. Pinke*, 614 F. App'x 651, 653 (4th Cir. 2015) (unpublished) (finding "sufficient evidence of authentication" of a prison's closed circuit video where "a Government witness explained the manner in which the prison's closed circuit video system operates, the means by which he obtained the video, and that he downloaded it onto the DVD that was played for the jury.").

The United States will pursue stipulations with the defendant related to the authenticity of USCP CCTV and MPD BWC. These stipulations have been entered into frequently in January 6-related trials. If necessary, however, USCP and MPD witnesses are available to testify to the reliability of the systems employed by USCP and MPD, respectively, to create and maintain these videos.

### 5.   Authentication Based on Status as an "Official Publication"

Certain evidence in this case, such as video taken by the Senate Recording Studio, is also "self-authenticating," meaning it "require[s] no extrinsic evidence of authenticity in order to be admitted." Fed. R. Evid. 902.[1]  This is so because it qualifies as an "Official Publication[]," defined as any "book, pamphlet, or other publication purporting to be issued by a public authority." Fed. R. Evid. 902(5). Official materials published on government websites fall into this category and are self-authenticating under Rule 902. *See Williams v. Long*, 585 F. Supp. 2d 679, 685–90 (D. Md. 2008); *cf. MMA Consultants 1, Inc. v. Republic of Peru*, 245 F. Supp. 3d 486, 503–04 (S.D.N.Y. 2017) (Congressional transcripts); *Singletary v. Howard Univ.*, No. 1:17-cv-01198,

---

[1] Further underscoring the multiple paths to authentication, the Senate Recording Studio footage may also be authenticated through any of the mechanisms outlined in this motion, including Fed. R. Evid. 901(b)(1), (3), (4), (9).

2018 WL 4623569, at *4 n.1 (D.D.C., Sept. 26, 2018) (government-issued guidebook), *rev'd on other grounds*, 939 F.3d 287.

The United States Senate uses the Senate Recording Studio to contemporaneously record Senate proceedings and distribute those recordings to the public. *See* https://www.senate.gov/–floor/, last accessed Dec. 15, 2022 (publicly available archived recordings of Senate Recording Studio).  The Senate Recording Studio recorded the proceedings relating to the Electoral College Certification on January 6, 2021, up to the point when the rioters breached the building and forced the proceedings into recess. *See id.*, January 6, 2021.  Subsequently, the Senate Recording Studio recorded the Electoral College Certification proceedings after the rioters were cleared from the Capitol Building and the session resumed. *Id.*  During the interim, the Senate Recording Studio captured footage of rioters who were present on the Senate floor during the recess. *Id.*

### C.    Categories of Multimedia To Be Offered

The United States plans to introduce certain videos and photos recovered from defendant Bisignano's phone and social media accounts, other defendants' phones and social media accounts, as well as videos and photographs taken by third parties such as other rioters and journalists who were present inside and outside the Capitol on January 6.  Among other ways, these materials can be authenticated through the processes described above.

The evidence at trial will also include video captured by law enforcement, including CCTV and BWC footage.  Like any other videos, these can be authenticated by any person with direct knowledge of the scene depicted or with sufficient circumstantial knowledge, *see* Fed. R. Evid. 901(b)(1), or through metadata or comparison, *see* Fed. R. Evid. 901(b)(4).  Alternatively, given the automated nature of the recording devices in question, the BWC and CCTV footage can be authenticated under Rule 901(b)(9), which allows authentication by "[e]vidence describing a

process or system and showing that it produces an accurate result." Fed. R. Evid. 901(b)(9); *see Dale*, 991 F.2d at 843; *Pinke*, 614 F. App'x at 653.

The United States also anticipates introducing videos captured by the Senate Recording Studio, which can be authenticated through any of the processes described above.

## II.     Motion *in Limine* To Admit Certain Statutes and Records

### A.     Judicial Notice of the Federal Electoral College Certification Law

The proceedings that took place on January 6, 2021, were mandated by, and directed under the authority of, several constitutional and federal statutory provisions. In fact, as Vice President Pence gaveled the Senate to Order on January 6, 2021 to proceed with the Electoral College Certification Official Proceeding, he quoted directly from, and cited to, Title 3, United States Code, Section 17.

The United States requests that the Court take judicial notice of, and admit into evidence, copies of Article II, Section 1 of the Constitution of the United States, the Twelfth Amendment, as well as 3 U.S.C. §§ 15–18 relating to the Electoral College Certification Official Proceedings. It is well established that district courts may take judicial notice of law "without plea or proof." *See United States v. Davila-Nieves*, 670 F.3d 1, 7 (1st Cir. 2012) (quoting *Getty Petroleum Mktg., Inc. v. Capital Terminal Co.*, 391 F.3d 312, 320 (1st Cir. 2004)). The United States makes this request even though "no motion is required in order for the court to take judicial notice." *Moore v. Reno*, No. 00-5180, 2000 WL 1838862, at *1 (D.D.C. Nov. 14, 2000).

### B.     Admission of the Congressional Record and S. Con. Res 1

The Congressional proceedings on January 6, 2021, were memorialized in the Congressional Record. The Congressional Record is a public record under Federal Rule of Evidence 902(5). *See MMA Consultants*, 245 F. Supp. 3d at 503–04. The United States intends

to introduce portions of the Congressional Record at trial, including the bodies' "concurrent resolution to provide for the counting on January 6, 2021, of the electoral votes for President and Vice President of the United States," S. Con. Res. 1, 117th Cong. (2021).  For the same reasons as the Senate Recording Studios footage above, these records should be admitted as self-authenticating.

### III.    Motion *in Limine* To Limit Unnecessary Discussion of Security-Related Topics

Certain topics that could arise at trial—namely the exact locations of USCP CCTV cameras and the protocols of the U.S. Secret Service (USSS), and law enforcement preparations for the January 6 riot—have little to no probative value but would compromise significant security interests if needlessly disclosed to the public.  The United States does not intend to elicit testimony on any of these topics in its case-in-chief and, therefore, cross-examination on such topics would be beyond the scope of direct examination and impermissible.  Fed. R. Evid. 611(b).  To the extent that the defendant seeks to argue that any of these topics are relevant and within the scope of the direct examination, the United States requests an order under Fed. R. Evid. 403 foreclosing unnecessary cross-examination on these topics.

It is well-established that a district court has the discretion to limit a criminal defendant's presentation of evidence and cross-examination of witnesses.  *See Alford v. United States*, 282 U.S. 687 (1931) ("The extent of cross-examination [of a witness] with respect to an appropriate subject of inquiry is within the sound discretion of the trial court."); *United States v. Whitmore*, 359 F.3d 609, 615–16 (D.C. Cir. 2004) ("The district court . . . has considerable discretion to place reasonable limits on a criminal defendant's presentation of evidence and cross-examination of government witnesses.").  A court has the discretion to prohibit cross-examination that goes beyond matters testified to on direct examination.  Fed. R. Evid. 611(b).  This is particularly so

when the information at issue is of a sensitive nature.  *See, e.g.*, *United States v. Balistreri*, 779 F.2d 1191, 1216–17 (7th Cir. 1985) (upholding district court's decision to prohibit cross-examination of agent about sensitive information about which that agent did not testify on direct examination and which did not pertain to the charges in the case), *overruled on other grounds*, *Fowler v. Butts*, 829 F.3d 788 (7th Cir. 2016).

The Confrontation Clause guarantees only "an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985).  Even evidence that may be relevant to an affirmative defense should be excluded until the defendant sufficiently establishes that defense through affirmative evidence presented during his own case-in-chief.  *See United States v. Lin*, 101 F.3d 760, 768 (D.C. Cir. 1996) (acknowledging trial court has discretion to limit cross-examination on prejudicial matters without reasonable grounding in fact); *United States v. Sampol*, 636 F.2d 621, 663–64 (D.C. Cir. 1980) (holding that trial court properly limited cross-examination of alleged CIA murder scheme until defense put forth sufficient evidence of the affirmative defense in its case-in-chief).  Preventing the defendant from exploring the topics identified above will not infringe her Confrontation Clause rights, because the exact positions of cameras, the camera map, the U.S. Secret Service protocols, and law enforcement preparations for January 6 implicate national security concerns, are of marginal probative value, and any probative value can be addressed without compromising the protective functions of government agencies.

A.    **Exact Locations of USCP Cameras**

The United States seeks an order limiting the defense from probing, during cross-examination, the exact locations of U.S. Capitol Police surveillance cameras or from using the maps, which show each camera's physical location, as an exhibit at trial.  The United States

produced such information to the defendant in discovery pursuant to the Highly Sensitive designation of the Protective Order. The defendant has been able to make use of such information in order to identify evidence and prepare for trial; however, none of the information serves to illuminate any fact of consequence that is before the Court.

This lack of relevance must be balanced against the national security implications at stake. The U.S. Capitol Police's surveillance system serves an important and ongoing function in protecting Congress, and therefore, national security. Furthermore, the United States represents that the maps that show the physical location of cameras have been designated as "Security Information" under 2 U.S.C. § 1979, which generally requires approval of the U.S. Capitol Police Board before they may be released.

Evidence about the exact locations of cameras, and the maps used to locate the cameras, should be excluded in light of the ongoing security needs of Congress. Absent some concrete and specific defense need to probe the camera's location, there is nothing to be gained from such questioning. A general description, and the footage from the camera itself, will make clear what the camera recorded and what it did not. Additionally, presenting the map of all U.S. Capitol Police cameras would risk compromising these security concerns for no additional probative value: the map contains numerous cameras installed in parts of the Capitol that the defendant did not visit.

Here, the video footage itself reveals the general location and angle of the camera's positioning. Additional details as to the precise location of the cameras are not relevant to the Court's fact-finding mission. Even assuming the evidence that the United States seeks to exclude is marginally relevant, such relevance is substantially outweighed by the danger to national security. The Supreme Court has recognized that trial courts' balancing should account for

concerns extrinsic to the litigation, such as "witness' safety." *Olden v. Kentucky*, 488 U.S. 227, 232 (1988) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)). Accordingly, courts have properly balanced the sensitivity of national security-related information against the probative value of such information to the case, excluding the evidence where its relevance is slight. *See, e.g.*, *United States v. Marshall*, 544 F. Supp. 3d 1032, 1042 (D. Mont. 2021); *United States v. Mohammed*, 410 F. Supp. 2d 913, 918 (S.D. Cal. 2005); *cf. United States v. Sarkissian*, 841 F.2d 959, 965 (9th Cir. 1988) (endorsing balancing test in context of Classified Information Procedures Act). If a map that revealed the location of all Capitol cameras were introduced in this trial, or in any trial, it would become available to the general public and foreign adversaries. Immediately, anyone could learn about the U.S. Capitol Police's camera coverage as of January 6, 2021, and, importantly, could learn about the parts of the Capitol where cameras were not installed. Broader presentation of evidence about camera locations could compromise national security without adding any appreciable benefit to the determination of the truth, or the veracity or bias of witnesses.

### B.     Secret Service Protocols

To meet its burden of proof at trial, the United States may call a witness from the United States Secret Service to testify that at the time of the Capitol breach, Secret Service agents were on duty to protect Vice President Mike Pence and his two immediate family members, all of whom were present at the Capitol. The witness may further testify about the Capitol breach's effect on the Secret Service's protection of Vice President Pence and his family members. The purpose of this testimony will be to explain, in part, the bases for enhanced security controls at the Capitol on January 6.

The very nature of the Secret Service's role in protecting the Vice President and his family implicates sensitive information related to that agency's ability to protect high-ranking members of the Executive branch and, by extension, national security.  Thus, the United States seeks an order limiting the cross-examination of the Secret Service witnesses to questioning about the federally protected function performed by the Secret Service as testified to on direct exam, namely, protecting the Vice President and his family.  The United States further requests that such an order preclude cross examination that would elicit information that does not directly relate to whether the Secret Service was performing that function at the Capitol on January 6, 2021.  Specifically, cross-examination should not be permitted to extend to (1) Secret Service protocols related to the locations where protectees or their motorcades are taken at the Capitol or other government buildings when emergencies occur, and (2) details about the nature of Secret Service protective details, such as the number and type of agents the Secret Service assigns to protectees.  These topics have no relevance to any issue at controversy, and even if they did, any relevance would be substantially outweighed by the danger of prejudicing the United States's legitimate interest in the safety of senior government officials.  *See* Fed. R. Evid. 403.

Cross-examination of Secret Service witnesses about extraneous matters beyond the scope of direct examination should be excluded as irrelevant or unduly prejudicial.  Specifically, the Secret Service's general protocols about relocation for safety should be excluded as irrelevant because such evidence does not tend to make a fact of consequence more or less probable.  *See* Fed. R. Evid. 401.  Similarly, evidence of the nature of Secret Service protective details is not relevant in this case.  The disorder on January 6 interfered with the Secret Service's duties to protectees in this case insofar as they were required to evade the mob.  The number or type of assigned agents on a protective detail is not relevant and could not alter the probability that there

was interference with the Secret Service.  None of the other elements to be proven, or available defenses, implicates further testimony from the Secret Service.

Even assuming the evidence to be excluded is marginally relevant, such relevance is substantially outweighed by the danger of confusion of the issues, undue delay, and waste of time. Broader cross-examination of Secret Service witnesses could compromise national security without adding any appreciable benefit to the determination of the truth, or the veracity or bias of witnesses.[2]

### C. Law Enforcement Preparations

The United States anticipates calling witnesses at trial from various law enforcement entities present at the United States Capitol on January 6, 2021, including witnesses from the United States Secret Service, the United States Capitol Police, and the Metropolitan Police Department.  Law enforcement witnesses will testify to, inter alia, the events at the Capitol on January 6, 2021, and the effect those events had on law enforcement and the proceedings taking

---

[2] If the defense believes that it is necessary to present evidence or cross-examine witnesses about the exact locations of USCP cameras or USSS procedures, the United States requests that the Court conduct a hearing in camera to resolve the issue.  Courts have found that in camera proceedings are appropriate in circumstances where security concerns like these are present. *See United States v. Nixon*, 418 U.S. 683, 714 (1974) (affirming district court's order for in camera inspection of subpoenaed presidential materials); *United States v. Kampiles*, 609 F.2d 1233, 1248 (7th Cir. 1979) ("It is settled that in camera . . . proceedings to evaluate bona fide Government claims regarding national security information are proper."); *In re Taylor*, 567 F.2d 1183, 1188 (2d Cir. 1977) (finding that in camera proceedings "serve to resolve, without disclosure, the conflict between the threatened deprivation of a party's constitutional rights and the Government's claim of privilege based on the needs of public security"); *United States v. Brown*, 539 F.2d 467, 470 (5th Cir. 1976) (per curiam) ("This Circuit, too, has repeatedly approved the use of in camera examinations as the means for resolving the conflict between a defendant's need for evidence and the government's claim of privilege based on the needs of public security.").  At any such hearing, the defendant should be required to make a specific proffer of some relevant purpose that is not substantially outweighed by the prejudice that disclosure would inflict on the United States's security interests. *Cf. United States v. Willie*, 941 F.2d 1384, 1393 (10th Cir. 1991) (explaining that a "proffer of great specificity" was necessary to support admission of testimony that could have proper or improper purposes).

place within Congress that day.  The purpose of this testimony will be to explain, in part, the obstruction of the official proceeding.

The United States does not anticipate asking these law enforcement witnesses on direct examination about their knowledge of or the adequacy of their planning regarding the riot that would ultimately take place on January 6, 2021.  Accordingly, the United States seeks an order limiting the cross-examination of law enforcement witnesses to preclude questions related to their knowledge of or preparations for the January 6, 2021 riot.  These topics have no relevance to any issue at controversy.  *See* Fed R. Evid. 401; *see also United States v. Edward Badalian*, Trial Tr. 04/04/23 ("Badalian Verdict"), at 35 ("[E]ven if every single member of law enforcement was . . . clueless . . . the record amply supports a finding that this defendant knew what he intended to do and why he was there.  Just because no one else, no one in a position to intervene was aware of the conversations he tried to keep within a close group of confidants, doesn't mean they weren't happening.").  Even if there were marginal relevance to such testimony, any relevance would be substantially outweighed by the risk of confusing the issues.  *See* Fed. R. Evid. 403.

## IV. Motion *in Limine* To Preclude Defendant's Introduction of Her Own Out-of-Court Statements as Inadmissible Hearsay

A defendant's own out-of-court statements are hearsay that cannot be admitted to prove the truth of any matter asserted.  Fed. R. Evid. 801, 802.  Although the United States may offer the defendant's statements as statements of a party opponent, Fed. R. Evid. 801(d)(2)(A), or other non-hearsay, the defendant has no corresponding right to admit her own statements without subjecting herself to cross-examination.

### A. The Rule of Completeness Cannot Circumvent the Rule Against Hearsay

Federal Rule of Evidence 106, the "Rule of Completeness," does not provide an end-run around the prohibition against hearsay.  That rule provides that, "[i]f a party introduces all or part

of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time." Fed. R. Evid. 106. Rule 106 directs the Court to "permit such limited portions [of a statement] to be contemporaneously introduced as will remove the distortion that otherwise would accompany the prosecution's evidence." *United States v. Sutton*, 801 F.2d 1346, 1369 (D.C. Cir. 1986). The rule does not "empower[] a court to admit unrelated hearsay." *United States v. Woolbright*, 831 F.2d 1390, 1395 (8th Cir. 1987). "[T]he provision of Rule 106 grounding admission on 'fairness' reasonably should be interpreted to incorporate the common-law requirements that the evidence be relevant, and be necessary to qualify or explain the already introduced evidence allegedly taken out of context . . . . In almost all cases we think Rule 106 will be invoked rarely and for a limited purpose." *Sutton*, 801 F.2d at 1369.

In this case, some of defendant's statements to be offered by the United States were made in chat groups, or using social media accounts, that were active over extended periods of time. Rule 106 does not make all statements within these groups and accounts admissible over a hearsay objection, but only those narrow portions that are necessary to "correct a misleading impression." *Sutton*, 801 F.2d at 1368 (quoting Rule 106 advisory committee notes). By way of analogy, Courts of Appeals have rejected the notion that "all documents contained in agglomerated files must be admitted into evidence merely because they happen to be physically stored in the same file." *Jamison v. Collins*, 291 F.3d 380, 387 (6th Cir. 2002) (quoting *United States v. Boylan*, 898 F.2d 230, 257 (1st Cir. 1990)).

Accordingly, at trial the Court should reject any effort by defendant to use the Rule of Completeness as a backdoor to admit otherwise inadmissible hearsay.

**B.      Law Enforcement Testimony Cannot Circumvent the Rule Against Hearsay**

Another mechanism by which the United States anticipates that the defendant may attempt to introduce her own prior statements is through the testimony of law enforcement officers with whom she had communications.  The United States anticipates that the defendant may seek to call law enforcement officers or agents, at least in part, to elicit self-serving statements made by the defendant to law enforcement about her travels to Washington, D.C. or experiences at protests in California. Any such statements by the defendant, if offered for the truth of the matter asserted, would be inadmissible hearsay.

An equally defective mechanism by which counsel might attempt to introduce the defendant's prior statements would be for the defendant to elicit lay opinion testimony from the officers or agents.  As an initial matter, such testimony would likely be irrelevant and inadmissible on that basis.   Additionally, if such opinions are predicated on self-serving statements by defendant, the opinion testimony is likewise inadmissible as a vehicle to admit defendant's hearsay.  The Federal Rules of Evidence allow only expert witnesses to offer opinions based on otherwise-inadmissible evidence, Fed. R. Evid. 703, and even in that context, expert opinion testimony cannot be a backdoor for hearsay.  *See Gilmore v. Palestinian Interim Self-Government Authority*, 843 F.3d 958, 972 (D.C. Cir. 2016) ("The expert must form his own opinions by applying his extensive experience and a reliable methodology to the inadmissible materials. Otherwise, the expert is simply repeating hearsay evidence without applying any expertise whatsoever, a practice that allows the [proponent] to circumvent the rules prohibiting hearsay") (internal quotation marks and alterations omitted) (quoting *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008); *DL v. D.C.*, 109 F. Supp.3d 12, 30 (D.D.C. 2015) ("An expert is entitled to rely on inadmissible evidence in forming his or her opinion, though the expert 'must form his or

her own opinions by applying his or her extensive experience and a reliable methodology to the inadmissible materials,' rather than simply 'transmit' the hearsay to the jury." (alterations omitted) (quoting *Mejia*, 545 F.3d at 197)).  At trial, the Court should reject any effort by the defendant to admit otherwise inadmissible hearsay indirectly through a law enforcement officer or other percipient witness.

### V.  Motion *in Limine* To Preclude Improper Defense Arguments

#### A.  First Amendment

The United States moves this Court to admit in its case-in-chief statements that evince the defendant's motive or intent, or which go to prove an element of any offense with which they are charged.  In anticipation that the defendant may seek to oppose introduction of her statements on First Amendment grounds, or may cite the First Amendment in arguments to the Court, the United States also moves *in limine* to preclude the defense from eliciting evidence or arguing that her statements and actions were protected by the First Amendment.

#### 1.  Admission of Defendant's Statements Does Not Violate the First Amendment

The United States intends to introduce several statements, made by defendant, that will aid the Court's determination as to whether the United States has met the elements of the obstruction statute at issue and to show motive and intent.  *See Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993) (holding that the First Amendment "does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent"). "Evidence of a defendant's previous declarations or statements is commonly admitted in criminal trials subject to evidentiary rules dealing with relevancy, reliability, and the like."  *Id.*  Accordingly, the United States asks that the Court rule that the First Amendment does not bar admission at trial of any statement that the United

States offers to establish the defendant's motive, intent, or an element of the crime, such as whether she possessed *mens rea* required to convict her of the crimes with which she is charged.

Courts across the country, including this Court's colleagues in January 6th cases, have allowed evidence of defendants' statements for the purposes sanctioned by *Mitchell*.  As Judge Cooper recently ruled:

> Nor does the Court find any First Amendment concerns in the government's use of Robertson's statements to show intent. . . .  If Robertson had expressed his views only through social media, he almost certainly would not be here.  But he also allegedly took action—entering the Capitol without lawful authority in an alleged attempt to impede the Electoral College vote certification.  His words remain relevant to his intent and motive for taking those alleged actions.

*United States v. Robertson*, 588 F. Supp. 3d 114, 124 (D.D.C. 2022) (internal citation omitted). Outside of the context of January 6th, *Mitchell* has been cited to uphold the admission of a wide range of statements, including but not limited to rap lyrics, terrorist materials, and speeches advocating civil disobedience.  *See United States v. Smith*, 967 F.3d 1196, 1205 (11th Cir. 2020) (rap lyrics); *United States v. Pierce*, 785 F.3d 832, 841 (2d Cir. 2015) (rap lyrics and tattoos); *United States v. Salameh*, 152 F.3d 88, 111–12 (2d Cir. 1998) (terrorist materials); *United States v. Fullmer*, 584 F.3d 132, 158 (9th Cir. 2009) (speeches advocating civil disobedience).[3]

The defendant's statements that shed light on the elements of the offenses, or motive or intent, should be admitted in this case as expressly permitted by *Mitchell*, regardless of whether any of those statements may otherwise constitute speech protected by the First Amendment.

---

[3] The court in *Fullmer* specifically noted that one particular defendant's conduct—which included writing an editorial and recruiting speakers to travel and advocate on behalf of his organization—was not criminal, and that punishing him based on that conduct alone would be unconstitutional. *Fullmer*, 584 F.3d at 158.  The court nonetheless, citing *Mitchell*, held that this defendant's "conduct . . . does provide circumstantial evidence from which a jury could have reasonably inferred that Harper was involved in a conspiracy."  *Id.*

### 2. Defendant Should Be Precluded from Raising a First Amendment Defense to the Court

The United States also moves *in limine* to preclude the defendant from arguing to the Court that her conduct was protected by the First Amendment.  None of the offenses with which the defendant is charged punish speech, as crimes such as threats or solicitation do.  The crimes with which the defendant is charged punish the corrupt obstruction, influence, or impediment of an official proceeding (violation of 18 U.S.C. § 1512(c)(2)) and other actions taken during the riot which destroyed government property (violation of 18 U.S.C. § 1361).

If the United States establishes the elements of any of the offenses with which the defendant is charged, the First Amendment provides her no defense, even if evidence of the defendant's crimes is intertwined with political discussion and rhetoric.  *See United States v. Amawi*, 695 F.3d 457, 482 (6th Cir. 2012) ("[A]lthough the conspiracy was closely related to, and indeed proved by, many of the defendants' conversations about political and religious matters, the conviction was based on an agreement to cooperate in the commission a crime, not simply to talk about it."); *see also United States v. Hassan*, 742 F.3d 104, 127–28 (4th Cir. 2014) (citing *Amawi*).

Accordingly, any line of cross-examination or argument that the defendant may wish to make regarding the First Amendment is irrelevant because it lacks a "tendency to make the existence of [a] fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," Fed. R. Evid. 401, and because she is not entitled to a First Amendment defense as a matter of law.  To the extent there is any relevance to any of the defendant's First Amendment claims, the Court should exclude any questioning and argument along those lines under Fed. R. Evid. 403.  Any attempt to shift the Court's attention to questions about whether the defendant's statements were protected by the First Amendment, rather than the charged offenses risks confusing the issues and wasting time.

21

**B.      Charging Decisions and Selective Prosecution**

The United States moves *in limine* to exclude all evidence and arguments regarding its charging decisions.  The Supreme Court has recognized that the "Attorney General and United States Attorneys retain 'broad discretion' to enforce the Nation's criminal laws." *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quoting *Wayte v. United States*, 470 U.S. 598, 607 (1985)). "They have this latitude because they are designated by statute as the President's delegates to help him discharge his constitutional responsibility to 'take Care that the Laws be faithfully executed.'" *Id.* (quoting U.S. Const. Art. II, § 3); *see* 28 U.S.C. §§ 516, 547.  As a general matter, "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978); *see also United States v. Batchelder*, 442 U.S. 114, 125 (1979) ("Selectivity in the enforcement of criminal laws is, of course, subject to constitutional constraints.").

Indeed, the D.C. Circuit has recognized that a selective prosecution claim implicates "an issue of law entirely independent of the ultimate issue of whether the defendant actually committed the crimes for which she was charged." *United States v. Washington*, 705 F.2d 489, 495 (D.C. Cir. 1983); *see also United States v. Stone*, 394 F.Supp.3d 1, 30 n.24 (D.D.C. 2019) ("[T]he Supreme Court found that a claim of selective prosecution is not a 'defense' that triggers discovery under Rule 16, because a claim of selective prosecution is not a response to the government's case-in-chief."); *Armstrong*, 517 U.S. at 463 (noting "selective-prosecution claim is not a defense on the merits to the criminal charge").  After all, evidence that some other individual is currently uncharged or has been charged with a lesser crime than those charged here has no probative value to the issues at trial and serves only to confuse the issues.  *See* Fed. R. Evid. 402, 403; *see also*

*United States v. Reed*, 641 F.3d 992, 993–94 (8th Cir. 2011) (collecting cases and observing that "[s]everal circuits have unanimously upheld the exclusion of evidence of prior charging decisions on the ground that many factors unrelated to guilt may influence those decisions and their admission therefore risks misleading the jury and confusing the issues"); *United States v. Sutton*, No. CR 21-0598, 2022 WL 13940371, at *18 (D.D.C. Oct. 23, 2022) ("These issues are irrelevant, inappropriate for consideration by the jury, invite jury nullification, and distract from the issues at trial.").

The defendant should be precluded from introducing evidence or making arguments regarding charging decisions made by the United States.  To the extent that the defendant seeks to present evidence or arguments that other individuals have not been charged for related conduct or that it is unfair that she has been charged, while other individuals involved in related criminal conduct remain uncharged or charged with lesser offenses, such evidence is irrelevant, inadmissible, and serves only to divert the Court's attention to matters unrelated to defendant's guilt or innocence.[4]

### C.   Entrapment or Public Authority Defenses

The defendant should be prohibited from making arguments or attempting to introduce evidence that law enforcement gave permission to the defendant to enter the U.S. Capitol.  A public authority defense is available only where a defendant "has knowingly acted in violation of federal criminal law, but has done so in reasonable reliance on the authorization of a governmental official."  *United States v. Alvarado*, 808 F.3d 474, 484 (11th Cir. 2015).  Relatedly, the defense of entrapment by estoppel applies only "to a defendant who reasonably relies on the assurance of

---

[4] The United States does not, through this motion, seek to exclude evidence of charging decisions relating to cooperating witnesses for the limited purpose of impeaching the credibility of each witness's testimony.

a government official that specified conduct will not violate the law." *Id.* at 484–85. Such reliance must be "objectively reasonable." *United States v. Barker*, 546 F.2d 940, 948 (D.C. Cir. 1976). This defense is unavailable in this case, and the United States moves *in limine* to exclude evidence or argument targeted at such a defense. The defendant has just served notice pursuant to Rule 12.3(a)(1), claiming former President Donald Trump authorized her actions. ECF No. 90.

### 1.   The Defendant's Actions Were Not Authorized by the President

The defendant should be precluded from advancing a public authority defense. As an initial matter, former President Trump did not have the authority to permit or authorize anyone to obstruct Congress, nor promote anyone to destroy windows on the U.S. Capitol building, nor could he have lawfully sanctioned the attack on the United States Capitol on January 6 or any of the other criminal conduct allegedly perpetrated by the defendant. As Chief Judge Howell wrote in rejecting the idea of an entrapment-by-estoppel defense for January 6 defendants:

> [A President] cannot, in keeping with his constitutional function and his responsibilities under Article II, lawfully permit actions that directly undermine the Constitution. Thus, a President cannot, within the confines of his constitutional authority, prevent the constitutionally mandated certification of the results of a Presidential Election or encourage others to do so on his behalf, nor can he direct an assault on the coequal Legislative branch of government. Were a President to attempt to condone such conduct, he would act ultra vires and thus without the force of his constitutional authority. . . . Put simply, even if former President Trump in fact [explicitly directed the rioters' actions,] his statements would not immunize defendants charged with offenses arising from the January 6 assault on the Capitol from criminal liability.

*United States v. Chrestman*, 525 F. Supp. 3d 14, 32–33 (D.D.C. 2021). The D.C. Circuit came to the same conclusion in *United States v. North*, when addressing Oliver North's contention that President Ronald Reagan authorized his obstruction of Congress in that case. 910 F.2d 843, 879 (D.C. Cir. 1990) (per curiam), *opinion withdrawn and superseded in part on reh'g*, 920 F.2d 940 (D.C. Cir. 1990). The court made clear that "'[n]either the President nor any of [North's] superiors

had the legal authority to order anyone to violate the law,' particularly if such 'orders,' explicit or implicit, represented nothing more than [the President's] desires." *Id.* at 891 n.24.

Chief Judge Howell's opinion in *Chrestman* adopted a four-part test from the Tenth Circuit, which limits the entrapment-by-estoppel defense to narrow circumstances. *Chrestman*, 525 F. Supp. 3d at 33 (citing *United States v. Cox*, 906 F.3d 1170, 1191 (10th Cir. 2018)). "To win an entrapment-by-estoppel claim, a defendant criminally prosecuted for an offense must prove (1) that a government agent actively misled him about the state of the law defining the offense; (2) that the government agent was responsible for interpreting, administering, or enforcing the law defining the offense; (3) that the defendant actually relied on the agent's misleading pronouncement in committing the offense; and (4) that the defendant's reliance was reasonable in light of the identity of the agent, the point of law misrepresented, and the substance of the misrepresentation." *Id.* (quoting *Cox*, 906 at 1191).

Here, the defendant cannot meet the requirements of the Tenth Circuit's four-part test. To begin, the defendant cannot point to any government official who advised her that her conduct was legal. Former President Trump's speech on January 6, 2021 could not satisfy the first prong of the Tenth Circuit's test, should the defendant argue she was relying on his orders. Former President Trump did not state that the U.S. Capitol grounds were no longer "restricted" under 18 U.S.C. § 1752(a); nor that it would not constitute obstruction of the proceeding to enter the Capitol building under 18 U.S.C. § 1512(c)(2); nor that property inside the Capitol building was not government property, and so could be destroyed notwithstanding 18 U.S.C. § 1361. Former President Trump did not purport to reinterpret a specific criminal statute to render the defendant's conduct noncriminal. He therefore did not "actively mis[lead]" the defendant "about the state of the law

defining the offense." *Cox*, 906 F.3d at 1191.  The defendant has not identified anyone else who might have authority to do so who did so either.

And even if the defendant was able to point to such a government official, which she cannot, the defendant could not show that her reliance was reasonable.  "[R]easonable reliance occurs" only "if 'a person sincerely desirous of obeying the law would have accepted the information as true, and would not have been put on notice to make further inquiries.'"  *United States v. Lynch*, 903 F.3d 1061, 1077 (9th Cir. 2018) (quoting *United States v. Batterjee*, 361 F.3d 1210, 1216–17 (9th Cir. 2004)); *see United States v. Corso*, 20 F.3d 521, 528 (2d Cir. 1994) (adopting "sincerely desirous" standard).  It is objectively unreasonable to conclude that then-President Trump could authorize citizens to break into the Capitol and interfere with the Electoral College proceedings that were being conducted.  Indeed, the Supreme Court has made clear that an entrapment-by-estoppel defense is not available in cases where a government official's directive constitutes a "waiver of law" beyond the official's lawful authority.  *Cox v. Louisiana*, 379 U.S. 559 (1965) (drawing an "obvious[]" distinction between identifying an area for lawful protest and "allowing one to commit, for example, murder, or robbery").  Any "instruction" from a President to wage an unlawful assault on the Legislative branch of government would exceed the President's constitutional authority.  *See Chrestman*, 525 F. Supp. 3d at 33 ("Were a President to attempt to condone such conduct, he would act *ultra vires* and thus without the force of his constitutional authority." (citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 588–89 (1952))).  This is because "no President may unilaterally abrogate criminal laws duly enacted by Congress as they apply to a subgroup of his most vehement supporters."  *Chrestman*, 525 F. Supp. 3d at 32. Accordingly, any such argument would be *per se* unreasonable.

The defendant's conduct was plainly beyond any conduct that could be reasonably sanctioned. The defendant should be prohibited from making arguments or attempting to introduce irrelevant evidence that former President Trump or any other government official authorized her conduct at the Capitol.

## 2.   The Defendant's Actions Were Not Authorized by Law Enforcement

The same reasoning applies to any argument based on acts or omissions of the U.S. Capitol Police or other law enforcement: "the logic in *Chrestman* that a U.S. President cannot unilaterally abrogate statutory law applies with equal force to government actors in less powerful offices, such as law enforcement officers protecting the U.S. Capitol Building." Memorandum and Order, *United States v. Williams*, No. 21-cr-377-BAH, at *2 (D.D.C. June 8, 2022), ECF No. 87. Even if the defendant could establish that a member of law enforcement told them that it was lawful to enter the Capitol building or allowed them to do so, the defendant's reliance on any such statement would not be reasonable in light of the "obvious police barricades, police lines, and police orders restricting entry at the Capitol." *Chrestman*, 525 F. Supp. 3d at 32.

In addition to prohibiting any defense arguments that law enforcement actively communicated to the defendant that entering the Capitol building or grounds was lawful, the Court should also bar the defendant from arguing that any failure to act by law enforcement rendered their conduct legal. The same reasoning that applied in *Chrestman* again applies here. That is, like the Chief Executive, a Metropolitan Police Officer or U.S. Capitol Police Officer cannot "unilaterally abrogate criminal laws duly enacted by Congress" through his or her purported inaction. *Chrestman*, 525 F. Supp. 3d at 33. An officer cannot shield an individual from liability for an illegal act by failing to enforce the law or ratify unlawful conduct by failing to prevent it. As Chief Judge Howell explained in the context of another January 6 case, "[s]ettled caselaw

makes clear that law officer inaction—whatever the reason for the inaction—cannot sanction unlawful conduct." *Williams*, No. 21-cr-377-BAH, at *3.

### 3.  The Defendant's Actions Were Not Caused by Agent Provocateurs

Defendants in other, unrelated January 6 cases have introduced arguments that their actions were encouraged by agents of the government.  Absent a proffer of evidence, such that the Court may evaluate the relevance of any such line of argument, the defendant should be precluded from making any such arguments. *Cf. Michelson v. United States*, 335 U.S. 469, 481 (1948) (approving of the trial court's "scrupulous" efforts to guard against the asking of "a groundless question to waft an unwarranted innuendo into the jury box.").

### D.  Additional Irrelevant Arguments

The defendant should be prohibited from making arguments or attempting to introduce irrelevant evidence that advocates for a verdict in the case based on factors others than the defendant's guilt or innocence.  In particular, the Court should permit no argument, evidence, or questioning regarding the following topics, which are legally and factually irrelevant to the case at hand.

### 1.  Use of Federal Resources and the Volume and Timing of Discovery

The United States requests that the defendant be precluded from arguing or eliciting testimony regarding the volume, nature, or timing of discovery or the volume and type of federal resources used in the investigation and prosecution of the case.  Any attempt by the defendant to comment on discovery or allocation of federal resources is irrelevant and unduly prejudicial.  Fed. R. Evid. 401, 402, 403.

### 2.  Defendant's Claimed Good Character

*Character Generally.*  The Court should exclude evidence and argument from defendant

introducing reputation or opinion evidence that defendant is generous, charitable, family-oriented, religious, or a community participant.  Evidence that a defendant possesses certain favorable character traits is admissible only when the trait is "pertinent" to the offense charged.  Fed. R. Evid. 404(a)(2)(A); *see, e.g.*, *United States v. Harris*, 491 F.3d 440, 447 (D.C. Cir. 2007); *United States v. Santana-Camacho*, 931 F.2d 966, 967–68 (1st Cir. 1991) (Breyer, C.J.).  But defendants may not provide evidence of possessing a generally good character.  *See, e.g.*, *United States v. Hill*, 40 F.3d 164, 168 (7th Cir. 1994) (court properly excluded "classic character evidence offered to prove that [defendant] had a good character and acted in conformity therewith"); *see United States v. Joseph*, 567 F. App'x 844, 849 (11th Cir. 2014) ("[W]hen the district court restricted defense counsel's comments about [defendant]'s honor and social contributions—comments that were part of his jury nullification efforts—the court did not deny [defendant] the opportunity to make a legally tenable argument.  Instead, it kept him from making impermissible arguments.").  Because none of the above characteristics are relevant to the charged offenses, the Court should exclude any evidence and argument addressing these character traits.

*Specific Instances of Conduct.*  The Court should also exclude evidence and argument of specific instances of defendant's good character, including caring for family members, donations, attending religious services, performing charitable or civic work, or other forms of generosity.  Rule 405(b) makes clear that unless a defendant's character or character trait is "an essential element of a charge, claim, or defense," he may not offer evidence of specific instances of good conduct.  Fed. R. Evid. 405(b).  Because none of the above instances of good conduct are relevant to an essential element of a charge, claim, or defense in this case, evidence of such should be excluded.  *See United States v. Bernard*, 299 F.3d 467, 476 (5th Cir. 2002) (approving court's sentencing instruction that jurors should not "consider the religious views of the defendants");

*Santana-Camacho*, 931 F.2d at 967 (excluding evidence that defendant was a good family man and a kind man because it was not a trait relevant to the offense); *United States v. Nazzaro*, 889 F.2d 1158, 1168 (1st Cir. 1989) (holding evidence of "bravery, attention to duty, perhaps community spirit" were "hardly 'pertinent' to the [charged] crimes"); *United States v. Morison*, 622 F. Supp. 1009, 10111 (D. Md. 1985) (holding "patriotism" was not a relevant trait to the charged offense).

### 3.   Defendant's Claimed Ignorance of the Law.

The Court should exclude evidence and argument from the defendant that she was ignorant of the illegality of the charged conduct.  "The general rule that ignorance of the law or a mistake of law is no defense to criminal prosecution is deeply rooted in the American legal system." *Cheek v. United States*, 498 U.S. 192, 199 (1991).  While there is a "narrow exception," *United States v. Brooks*, 681 F.3d 678, 700 n.18 (5th Cir. 2012), that exception is "reserved . . . to limited types of statutory violations involving 'complex' statutes—namely those governing federal tax law and antistructuring transactions."  *United States v. Kay*, 513 F.3d 432, 448 (5th Cir. 2007); *see Bryan v. United States*, 524 U.S. 184, 195 (1998).

Because ignorance of the law is not a defense to any of the charged offenses, any evidence and argument that defendant did not know that the charged conduct was illegal should be excluded as irrelevant, and defendant should not be permitted to ask witnesses if they knew her conduct was illegal or whether they intended to commit crimes.

## VI.   Motion *in Limine* To Admit Evidence of November 2020 and December 2020 Rallies

The United States hereby provides notice, consistent information produced in discovery, of its intent to introduce at trial evidence related to the defendant's attendance, in Washington

D.C., at rallies on November 14, 2020 and December 12, 2020, the purpose of which was to protest the November 2020 presidential election results.

### A. Legal Standard

"Rule 404(b) excludes only evidence 'extrinsic' or 'extraneous' to the crimes charged, not evidence that is 'intrinsic' or 'inextricably intertwined.'" *United States v. Allen*, 960 F.2d 1055, 1058 (D.C. Cir. 1992) ("[The evidence] was an intrinsic part of the witness' account of the circumstances surrounding the offense for which [defendant] was indicted (and also was relevant both to [defendant's] intent to distribute and his knowledge about [a co-conspirator's] drug cache."); *see also United States v. Miller*, 799 F.3d 1097, 1105 (D.C. Cir. 2015) ("The Rule does not bar 'evidence . . . of an act that is part of the charged offense,'"); *United States v. Mahdi*, 598 F.3d 883, 891 (D.C. Cir. 2010) ("No [404(b)] notice is required, however, for evidence of an 'intrinsic act,' that is, an act that is 'part of the crime charged.'"); *United States v. Washington*, 12 F.3d 1128, 1135 (D.C. Cir. 1994) ("Moreover, 'Rule 404(b) excludes only evidence 'extrinsic' or 'extraneous' to the crimes charged, not evidence that is 'intrinsic' or 'inextricably intertwined.'"); Fed. R. Evid. 404(b), Advisory Comm. Note regarding 1991 Amendment ("The amendment does not extend to evidence of acts which are 'intrinsic' to the charged offense."); *United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000) ("[U]ncharged acts performed contemporaneously with the charged crime may be termed intrinsic if they facilitate the commission of the charged crime," thus taking such acts outside the scope of Rule 404(b).).[5]

Even where evidence is not intrinsic, evidence subject to Federal Rule of Evidence 404(b) is nevertheless still admissible. The Federal Rules of Evidence simply prohibit "[e]vidence of a

---

[5] It should be noted that *Bowie,* 232 F.3d 923 seems to have questioned the admission of intrinsic other crimes evidence without a 404(b) analysis, but one panel of the Circuit cannot overrule standing precedent. *See, e.g.*, *United States v. Torres*, 115 F.3d 1033, 1036 (D.C. Cir. 1997)

crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b).  As the Court of Appeals has stated:

> Although stated as a restriction, the Rule is actually one of "inclusion rather than exclusion."  Evidence is only prohibited if it is offered for the impermissible inference that a defendant is of bad character resulting in bad conduct.  Thus evidence of a defendant's prior bad acts is admissible for purposes *unrelated* to the defendant's character or propensity to commit crime, such as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

*United States v. Cassell*, 292 F.3d 788, 792 (D.C. Cir. 2002) (internal citations omitted).  The Rule's list of permissible uses of bad-act evidence is illustrative, not exhaustive.  2 J. Weinstein and M. Berger, WEINSTEIN'S FEDERAL EVIDENCE § 404.22[6][a] (2017); *see, e.g.*, *Bowie*, 232 F.3d at 933 (approving admission of other crimes evidence to corroborate other evidence). The D.C. Circuit has held that Rule 404(b) is "quite permissive, excluding evidence only if it is offered for the sole purpose of proving that a person's actions conformed to his or her character." *United States v. Long*, 328 F.3d 655, 660–61 (D.C. Cir. 2003) (quotations and citations omitted); *see also United States v. Loza*, 764 F. Supp. 2d 55, 57 (D.D.C. 2011) (citing *United States v. Mahdi*, 598 F.3d 883, 891 (D.C. Cir. 2010)); *United States v. Pettiford*, 517 F.3d 584, 588 (D.C. Cir. 2008); *Miller*, 895 F.2d at 1436.

---

("panels of this court [] are obligated to follow controlling circuit precedent until either [the Court of Appeals] sitting *en banc*, or the Supreme Court, overrule it."); *see also United States v. Alexander*, 331 F.3d 116, 125–26 (D.C. Cir. 2003) ("Although we have recently expressed our dissatisfaction with the extrinsic-intrinsic distinction . . . we have nonetheless recognized that at least in a narrow range of circumstances . . . evidence can be 'intrinsic to' the charged crime").    In any event, the *Bowie* court recognized that its position does not affect the admissibility of the evidence: the "only consequences of labeling evidence 'intrinsic' are to relieve the prosecution of Rule 404(b)'s notice requirement and the court of its obligation to give an appropriate limiting instruction upon the defense counsel's request."

Analysis of the admissibility of bad-acts evidence involves two steps.  First, the Court determines "whether the evidence is probative of some issue other than character."  *Cassell*, 292 F.3d at 792.  Evidence of other crimes is admissible if it "is relevant, relates to something other than character or propensity, and supports a jury finding that the defendant committed the other crime or act."  *Id.* (citing *Bowie*, 232 F.3d at 926–27); *see also Huddleston v. United States*, 485 U.S. 681, 685 (1988).  "Only one series of evidential hypotheses is forbidden in criminal cases by Rule 404: a man who commits a crime probably has a defect of character; a man with such a defect of character is more likely than men generally to have committed the act in question."  *United States v. Moore*, 732 F.2d 983, 987 n.30 (D.C. Cir. 1984).  Second, the court must decide if the evidence should be excluded under Rule 403 of the Federal Rules of Evidence, *United States v. Clarke*, 24 F.3d 257, 264 (D.C. Cir. 1994), which precludes evidence only if "its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly cumulative evidence," Fed. R. Evid. 403.  "[T]he test under 403 is 'unfair prejudice,' not just any prejudice or harm to the defense."  *United States v. Sitzmann*, 856 F. Supp. 2d 55, 61–62 (D.D.C. 2012).

Notably, other acts evidence is often relevant to several issues.  In its *en banc* decision in *Crowder*, the Court of Appeals for the D.C. Circuit stated the following:

> Rule 404(b) evidence will often have such multiple utility, showing at once intent, knowledge, motive, preparation and the like. Proof of an individual's intent to commit an act may itself serve as proof that the individual committed the act, as the Supreme Court recognized more than a century ago. In proving that a defendant intended to distribute crack cocaine, for instance, the government might simultaneously be showing the defendant's motive to possess the crack, which Rule 404(b) permits. Intent would thereby serve as an intermediate fact from which the jury could infer another intermediate fact—motive—from which it could in turn infer the element of possession. Thus, other-offense evidence of intent would have probative value not just on the intent element, but also on the possession element of the offense.

*United States v. Crowder*, 141 F.3d 1202, 1208 (D.C. Cir. 1998) (*en banc*) (citation omitted). Thus, in *Crowder*, other acts evidence was admitted to show the defendant's knowledge, intent, and motive. And these admissible other acts may occur before or after the charged offense. *See, e.g.*, *United States v. Watson*, 894 F.2d 1345, 1349 (D.C. Cir. 1990) (admitting other crimes that occurred three months after charged offense); *United States v. Bibo-Rodriguez*, 922 F.2d 1398, 1400 (9th Cir. 1991) ("By it its very terms, 404(b) does not distinguish between 'prior' and 'subsequent' acts"); *United States v. Johnson*, 934 F.2d 936, 940 (8th Cir. 1991) ("[T]he mere subsequency of an act . . . does not on that ground alone make it incompetent.").

## B. The Proffered Evidence Is Admissible

The United States will seek to introduce the evidence described above. As an initial matter, because it is all tied together as part of the defendant's efforts to contest the 2020 presidential election results, the proffered evidence is admissible as intrinsic evidence that "arose out of the same transaction or series of transactions as the charged offense." *United States v. Badru*, 97 F.3d 1471, 1474 (D.C. Cir. 1996); *see also United States v. Lorenzana-Cordon*, 141 F. Supp. 3d 35, 40 (D.D.C. 2015). Moreover, even if the evidence were not intrinsic to the charged offenses, all of this evidence is also relevant to issues other than the defendant's character and, therefore, admissible pursuant to Rule 404(b).[6] For example, that the defendant felt strongly enough in her efforts to protest the 2020 presidential election result that she traveled across the country to Washington, D.C. for rallies not once, but three separate times, is highly relevant. It is material to show the defendant's intent, motive, preparation, plan, and knowledge. Fed. R. Evid. 404(b). The evidence of her lawfully protesting in D.C. on prior occasions is also relevant to her understanding

---

[6] Indeed, it is unclear what, if any, "character" trait the proffered evidence would even address. Because Rule 404(b) applies only evidence "to prove a person's character," it does not apply where, as here, the proffered evidence is not proof of a character trait at all. Fed. R. Evid. 404(b).

that storming the Capitol on January 6th and breaking windows on the Capitol building was not the legal way to "make her voice heard."  Such evidence is not unfairly prejudicial and therefore it is not subject to exclusion pursuant to Rule 403.  As such, at trial, the United States intends to introduce evidence related to Hostetter's travel to Washington, D.C., in November 2020.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court grant the requested relief or, if the Court reserves ruling, to consider the above arguments when the relevant issues arise during trial.

Date: June 14, 2024

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:     */s/ Kimberly L. Paschall*
KIMBERLY L. PASCHALL
D.C. Bar No. 1015665
Assistant United States Attorney
United States Attorney's Office
for the District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-2650
Kimberly.Paschall@usdoj.gov

By:     */s/ Anthony W. Mariano*
ANTHONY W. MARIANO
MA Bar No. 688559
Trial Attorney, Detailee
United States Attorney's Office
for the District of Columbia
601 D Street N.W.
Washington, DC 20530
(202) 476-0319
Anthony.Mariano2@usdoj.gov